# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**CRAIG LEAKS**

      Plaintiff,

CASE NO:

Vs

**GEOPOINT SURVEYING, INC.**

      Defendant(s).

_____/

## ORIGNAL COMPLAINT

COMES NOW, the Plaintiff, CRAIG LEAKS (Plaintiff), by and through his undersigned counsel, and files this original complaint against GEOPOINT SURVEYING, INC. ("the Defendant") and alleges:

### A. Jurisdictional Statement

1. The U.S. District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2. That the federal question involved in this case arises under Title VII of the 1964 Civil Rights Act and 42 U.S.C. § 1981 ("Equal Rights Under Law").

3. That the Plaintiff is a resident of Riverview, Florida. He is black/African American.

4. That the Defendant is a private company with its principal operation in Tampa, Florida.

5. The Plaintiff filed a charge of discrimination before the United States Equal Employment Opportunity Commission (EEOC) against the Defendant. The EEOC issued a notice of Suit Rights on December 17, 2018, and the Plaintiff received his certified copy of the said Notice of

Suit Rights on December 22, 2018. **Exhibit A**.

6.     The legal theories under Title VII of the 1964 Civil Rights Act, upon which this lawsuit is premised, is (a) hostile working environment or racial discrimination with regards to terms, conditions, and privileges of employment; and (b) retaliation.

7.     The legal theories under 42 U.S.C. Section 1981, upon which this lawsuit is premised, is (a) hostile working environment or racial discrimination with regards to terms, conditions, and privileges of employment; and (b) retaliation.

## STATEMENT OF FACTS

### Introduction

8.     Plaintiff Craig Leaks is a 33-year-old African American man. He started working in the surveying industry since 2013, having worked for Civil Surv (Lakeland, Florida) from 2013-16. At Civil Surv, Mr. Leaks attained substantial experience in the field of surveying and the said experience made in qualified for employment as "rod-man" at GeoPoint Surveying, Inc. (i.e., the Defendant). Mr. Leaks was hired by the Defendant for the position of "rod-man" on August 15, 2017.

9.     Defendant GeoPoint Surveying, Inc. ("Employer" or "Defendant") is a Tampa-based areal mapping, construction, hydrographic, and land-development company. It has office locations throughout the state of Florida; it hires between 150 and 200 employees at the Tampa location, and over 600 employees total throughout the state of Florida..

10.    During most of Mr. Leaks' tenure with the Defendant, he worked on a three-man crew, as follows:

   (a).   Evan Horne (white male), Party Chief;

  (b).  Walker Baumbach (white male), I-man;

  (c).  Craig Leaks (black/ African American), Rod-man.

12. Plaintiff Leaks was the most junior person on this three-person crew. He was required to take direct orders from Evan Horne (Party Chief). Mr. Horne reported to Vernon Horne, who is the company president and the father of Evan Horney, the Party Chief on the Plaintiff's crew.

13. Plaintiff Leaks' job duties as the crew "rod-man" included the following: to have the truck prepared in the morning; to make sure that the all essential equipment was loaded onto the work truck; and to assist the I-man and the Party Chief.[1]

12. The Plaintiff successfully completed GeoPoint's 90-day probationary period. Vernon Horne, Company President, approved the Plaintiff's successful completion of his probationary period.

13. The Plaintiff's first duty assignment was to work as a "rod-man" for a three-person crew, which included another crew-man named Brent Rodey (white male). The Plaintiff Leaks and Mr. Rodey worked together for about two months. Plaintiff Leaks experienced "problems" or "personality conflicts" with Mr. Rodey, and he reported these issues to Vernon Horne, the company president. Mr. Vernon Horne arranged to have Mr. Leaks transferred to his son's work-crew (i.e., the crew which included Evan Horne and William Brambaugh).

14. From between October 2017 and January 2018, the Plaintiff had a good working relationship with Evan Horne and Walker Brambaugh.

---

[1] The job duties of the I-man was to assist the Party Chief, and to assist him with anything that was needed. The party chief reviewed the blue prints and directed the I-man and the Rodman with accomplishing the objectives. This 3-man work crew would go to a job site, areas where there is rough terrain. The work crew makes an assessment as to what trees, debris or other man-made items will need to be removed prior to construction work taking place a job site. This team stakes-out these locations by placing wooden sticks with orange markers in the ground, in order to set off the areas of the construction work site.

15. However during the month of February 2018, Plaintiff Leaks began hearing anti-black and racialist comments, words, and jokes from both Evan Horne and Walker Brambaugh, as follows:

    a. On February 1, 2018, the Plaintiff was riding in the back seat of the company-owned King-Cab Ford F-150. Evan Horne was driving; Walker Brambaugh was in the front passenger seat. A black child, with back pack, was crossing the street. Walker said, "Get the f—k out the road, you stupid n—gger." Plaintiff felt very uncomfortable; he did not immediately report the incident.

    b. On February 12, 2018, the Plaintiff, Evan Horne, and Walker Brambaugh were at a job site. There were aquatic birds at the job site. The Plaintiff mentioned that the Chinese people used these aquatic birds to fish. Evan Horne said "He had a friend that called these birds, 'nigger' birds, because when they open their wings, they look like they are 'picking a fight.'" The Plaintiff was again shocked that this racial word was being uttered. Plaintiff did not immediately report this incident.

    c. On February 14, 2018, Evan had used the restroom. He stops the truck and go uses a port-a-potty. When he returned, he said that someone had written on the wall of the port-a-potty that said, "Look down to see Obama dolls." Plaintiff did not immediately report this incident.

    d. On February 16, 2018, the Plaintiff, Evan Horne, and Walker Brambaugh were sitting in the truck. They saw a black man walk past the truck. This black man was dark-skinned with tattoos. Walker Brambaugh said, "The guy wasted his money, because you can't even see the tattoes. The guy is so black, you can't even see the ink." Plaintiff did not immediately report

this incident.

  e. On February 28, 2018, the Plaintiff, Evan Horne, and Walker Brambaugh were sitting in the truck. They were parked at a job site. They observed a black foreman supervising and giving instructions to lower-level Hispanic workers. This black foreman used the word, "comprehende?" when speaking to these Hispanic workers. Walker Brambaugh commented: "See, white people aren't that racist." Plaintiff did not make respond, or immediately report this incident.

  f. On or about March 12, 2018, while sitting inside of the work truck, Evan Horne used the "n-word," during a conversation with Walker Brambaugh, saying, "Some said 'Vernon needs to hire more niggers to come cut line.'" Plaintiff was very offended by this comment; first, because the "n-word" is very offensive; second, the task of "cutting line" is one of the lowest jobs in the company; and, third, "cutting line" was a part of the Plaintiff's job description. Plaintiff did not make respond, or immediately report this incident.

  g. On March 13, 2018, Evan Horne and Walker Brambaugh got into wordy dispute. Plaintiff overheard Walker Brambaugh call Evan Horne the word "nigger." Plaintiff did not make respond, or immediately report this incident.

  h. On March 22, 2018, Evan Horne, Walker Brambaugh, and the Plaintiff were in the work truck. They drove up to a group of black workers, from a different company. These black workers were digging a ditch. Evan Horne and Walker Brambaugh got out of the truck and approached the black workers. One of the black workers allegedly said, "You look like a Hippie." When Evan Horne and Walker Brambaugh returned to the truck, Evan Horne said, "That comment was racist. What if I told them that they look like a bunch of drug dealers."

Plaintiff was very uncomfortable, but he did not immediately report this incidents.

  i.  On March 23, 2018, Evan Horne, Walker Brambaugh, and the Plaintiff were inside of the company truck. Walker Brambaugh received a telephone call and says, "What's up, nigger?" Plaintiff was very uncomfortable, but he did not immediately report this incidents.

  j.  In addition, Walker Brambaugh frequently used a joke about "white woman who is with a black man." He calls them a "Snicker Licker." The Plaintiff overheard this comment, in reference to white women and black men, on more than once occasion.

  k.  Finally, on one day, Evan once commented that when he was in grade school, a classmate mispronounced the name of the country in Africa (i.e., Niger), as the word "nigger." Evan Horne and Walker Brambaugh then chuckled.

16. On March 30, 2018, Plaintiff Leaks lodged his first and initial racial harassment complaint to the human resources manager Margo Rothenburg.

  a.  Plaintiff Leaks placed a telephone call to Ms. Rothernburg.

  b.  Plaintiff Leaks informed Ms. Rothernburg about several of the previously-stated incidents of racial slurs and racial discrimination, as stated above in paragraph 15.

  c.  Ms. Rothenburg instructed Plaintiff Leaks to report the harassing incidents to Vernon Horne, President.

  d.  Plaintiff Leaks reported the said racial harassment (i.e., as stated in paragraph 15) to the company president Vernon Horne on March 30, 2018.

  e.  On March 30, 2018, Vernon Horne met personally with Plaintiff Leaks. Plaintiff Leaks informed Mr. Horne that Evan Horne (his son) and Walker Brambaugh had been using racist slurs frequently and inappropriately in the workplace, and that their comments had

negatively impacted his mental constancy and caused great discomfort.

  f.  Following their conversation (March 30, 2018), company president Vernon Horne told Plaintiff Leaks to work on a different work crew for the remainder of the day (i.e., March 30, 2018). Plaintiff Leaks followed these instructions.

  g.  Following the end of the shift (March 20, 2018), Plaintiff Leaks met personally with human resources manager Margo Rothenburg.

    (1).  Plaintiff Leaks asked Ms. Rothenburge if he could write and submit a detailed, written statement of all of the past racial remarks (i.e., as stated in paragraph 15).

    (2).  Ms. Rothenburg instructed Mr. Leaks to not write out a detailed statement. She then asked him to verbally summarize his grievances.

    (3).  When Plaintiff Leaks commenced verbally explaining and summarizing his grievances (i.e., as stated in Paragraph 15), Ms. Rothenburg repeatedly interposed comments such as, "that's not enough evidence to prove discrimination," "boys will be boys," "well, if the racial remarks were not directed at you, then you shouldn't be offended," and "I've known Evan for several years, and I can't imagine that he would make a racist comment like that."

    (4).  Plaintiff Leaks was bewildered and discouraged after he exited the office of human resources manager Margo Rothenburg.

    (5).  Plaintiff Leaks did not argue with Ms. Rothenburg during or following their meeting on March 30, 2018. Plaintiff Leaks acted professionally towards her at all times.

      (6).    March 30, 2018 was a Friday. March 31, 2018 was a Saturday, and April 1, 2018 was a Sunday—Plaintiff Leaks was off from work on both this particular Saturday and Sunday.

17.    On Monday, April 2, 2018, company president Vernon Horne asked Plaintiff Leaks to come into an office. At first, Plaintiff insisted that he be allowed to record the meeting. Mr. Horne denied this request, but Plaintiff Leaks again insisted that he be allowed to record the meeting. Mr. Horne hesitated, briefly left Mr. Leaks, and went inside of another office. About twenty minutes later, Mr. Horne returned to Mr. Leaks and for the third time insisted that he come into an office to attend a meeting. Mr. Leaks agreed to attend the meeting.

18.    There were five other persons in the office, including:

      (1).  Vernon Horne, company president (white male)

      (2).  Margo Rothenburg, human resources manager (white male)

      (3).  David Williams, unknown position (white male)

      (4).  Justin Brantly, unknown (white male)

      (5).  Frank Biggs, company owner (white male)

19.    The subject-matter of this meeting of April 2, 2018 did not relate or pertain to the Plaintiff's work performance. No one in the meeting stated that Plaintiff Leaks had committed any workplace infractions or failed to meet reasonable performance expectations. Nor did anyone state that Plaintiff Leaks was unqualified for the position of "rod-man."

20.    Company President Vernon Horne, during the said meeting of April 2, 2018, simply informed Plaintiff Leaks, that the company wished to go in a different direction; that Plaintiff Leaks had previously had "problems with" Brent Rodey (white male); that Plaintiff Leaks now

8

had "problems with" Evan Horne; and that, for these reasons, the company wished for Plaintiff Leaks to sign a "voluntary resignation." However, Plaintiff Leaks refused to sign a voluntary resignation.

21.	On April 2, 2018, during the course of the said meeting, the Defendant terminated Plaintiff Leaks.

## COUNT I.   Racial Discrimination- Hostile Working Environment
### (Title VII of the 1964 Civil Rights Act)

22.	The Plaintiff hereby re-alleges and re-states averments 1 through 21, which should be read as a complete sub-part to this claim for relief, as per Rule 8 of the Fed.R.Civ.P.

23.	The Defendant, as stated in paragraph 15, subjected the Plaintiff to a hostile working environment.

24.	The nature of this hostile working environment was based upon race, racism, and anti-black ideals, including the frequent use of the word "nigger" and other derogatory racial slurs.

25.	This hostility was severe, because it was open, blatant, and obviously racial; this hostility was pervasive, in that it occurred with regularity and frequency.

26.	The said hostile working environment impacted the terms, conditions, and privileges of the Plaintiff's employment, in that he felt humiliated and very uncomfortable reporting to work, from the period February 1, 2018 through April 2, 2018.

27.	The Plaintiff Leaks reported this racial hostility to the Defendant on March 30, 2018. Therefore, the Defendant knew about the racial hostility.

28. The Defendant had a duty to take appropriate steps to investigate the said racial hostility and to take appropriate steps to abate the said hostility. However, the Defendant breached this duty of care, thus resulting in grave harm to the Plaintiff.

29. WHEREFORE, the Plaintiff demands:

    A. Trial by Jury.

    B. Judgment against the Defendants for compensatory and punitive damages.

    C. Affirmative Action, as deemed appropriate by the Court.

    D. Injunctive Relief, as deemed appropriate by the Court.

    E. Attorney's fees and costs.

    F. For whatever additional relief as is deemed just and appropriate by this honorable Court.

## COUNT II.   Racial Discrimination- Hostile Working Environment
### (Section 1981; 42 U.S.C.)

30. The Plaintiff hereby re-alleges and re-states averments 1 through 21, which should be read as a complete sub-part to this claim for relief, as per Rule 8 of the Fed.R.Civ.P.

31. The Defendant, as stated in paragraph 15, subjected the Plaintiff to a hostile working environment.

32. The nature of this hostile working environment was based upon race, racism, and anti-black ideals, including the frequent use of the word "nigger" and other derogatory racial slurs.

33. This hostility was severe, because it was open, blatant, and obviously racial; this hostility

was pervasive, in that it occurred with regularity and frequency.

34.     The said hostile working environment impacted the terms, conditions, and privileges of the Plaintiff's employment, in that he felt humiliated and very uncomfortable reporting to work, from the period February 1, 2018 through April 2, 2018.

35.     The Plaintiff Leaks reported this racial hostility to the Defendant on March 30, 2018. Therefore, the Defendant knew about the racial hostility.

36.     The Defendant had a duty to take appropriate steps to investigate the said racial hostility and to take appropriate steps to abate the said hostility. However, the Defendant breached this duty of care, thus resulting in grave harm to the Plaintiff.

37.     WHEREFORE, the Plaintiff demands:

    A.     Trial by Jury.

    B.     Judgment against the Defendants for compensatory and punitive damages.

    C.     Affirmative Action, as deemed appropriate by the Court.

    D.     Injunctive Relief, as deemed appropriate by the Court.

    E.     Attorney's fees and costs.

    F.     For whatever additional relief as is deemed just and appropriate by this honorable Court.

### COUNT III.   Retaliation (Title VII of the 1964 Civil Rights Act)

38.     The Plaintiff hereby re-alleges and re-states averments 1 through 21, which should be read as a complete sub-part to this claim for relief, as per Rule 8 of the Fed.R.Civ.P.

39.     On March 30, 2018, Plaintiff Leaks complained of racial harassment, as stated in paragraph 15, and thus he engaged in oppositional protected activity pursuant to Title VII of the

1964 Civil Rights Act.

40.     The Defendant terminated the Plaintiff because he complained of the said harassment as stated in paragraphs 1-21.

41.     There is a causal connection between the Plaintiff's protected activity and the Defendant's adverse employment action (i.e., termination) which it committed against the Plaintiff.

42.     WHEREFORE, the Plaintiff demands:

    A.     Trial by Jury.

    B.     Judgment against the Defendants for compensatory and punitive damages.

    C.     Affirmative Action, as deemed appropriate by the Court.

    D.     Injunctive Relief, as deemed appropriate by the Court.

    E.     Attorney's fees and costs.

    F.     For whatever additional relief as is deemed just and appropriate by this honorable Court.

**COUNT IV.   Retaliation (Title VII of the 1964 Civil Rights Act)**

43.     The Plaintiff hereby re-alleges and re-states averments 1 through 21, which should be read as a complete sub-part to this claim for relief, as per Rule 8 of the Fed.R.Civ.P.

44.     On March 30, 2018, Plaintiff Leaks complained of racial harassment, as stated in paragraph 15, and thus he engaged in oppositional protected activity pursuant to Title VII of the 1964 Civil Rights Act.

45.     The Defendant terminated the Plaintiff because he complained of the said harassment as stated in paragraphs 1-21.

46. There is a causal connection between the Plaintiff's protected activity and the Defendant's adverse employment action (i.e., termination) which it committed against the Plaintiff.

47. WHEREFORE, the Plaintiff demands:

    A. Trial by Jury.

    B. Judgment against the Defendants for compensatory and punitive damages.

    C. Affirmative Action, as deemed appropriate by the Court.

    D. Injunctive Relief, as deemed appropriate by the Court.

    E. Attorney's fees and costs.

    F. For whatever additional relief as is deemed just and appropriate by this honorable Court.

RESPECTFULLY SUBMITTED:

__/s/ Roderick O. Ford_____
Roderick O. Ford, Esq.
FBN: 0072620
The Cochran Firm—Tampa, LLC
400 N. Ashley Drive
26th Floor
Tampa, Florida 33602
(813) 223-1200
(813) 223-4221 facsimile
rford@cochranfirm.com