IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CRAIG LEEKS**

      Plaintiff,

                                  CASE NO: 19-CV-00562

Vs

**GEOPOINT SURVEYING, INC.**

      Defendant(s).

_____/

**PLAINTIFF'S MOTION FOR SANCTIONS
PURSUANT TO RULE 11 OF THE FEDERAL RULES OF
CIVIL PROCEDURE**

COMES NOW, the Plaintiff, **CRAIG LEEKS** by and through his undersigned counsel, pursuant to Rule 11 of the Federal Rules of Civil Procedure; Rule 4-3.1, "Meritorious Claims" of the Rules Regulating the Florida Bar; Rule 4-8.1(d) of the Rules Regulating the Florida Bar (including 42 U.S.C. § 1981; 13th Amendment, U.S. Constitution (Race Discrimination), and respectfully states:

**INTRODUCTION**

Justice Olive Wendell Holmes was famous for saying, "[t]he life of the law has not been logic: it has been experience."[1]  It is unfortunate that the nature of the conflict between the opposing view of the lawyers in this case centers upon the experience of race relations in the country, but not simply between the parties, but also between the lawyers as well. It is therefore

---

[1] Oliver Wendell Holmes, Jr., *The Common Law* (New York, N.Y.: Dover Pub., 1991), p 1.

appropriate to state that the Plaintiff's Attorney and the Plaintiff are African American men, whereas the two Defense Attorneys involved in this litigation are White American women. The nature of this litigation centers upon the federal civil rights laws prohibiting racial discrimination in employment, and the Defense Attorneys in this case represent an all-white management staff of a medium-size company located in central Florida. That communications breakdown and conflict has arisen was, unfortunately, to be expected. But this begs the question, "Who should bare the risk of loss in case such a communication breakdown occur?"

It is the undersigned's position here that the Defense Counsel's "Motion for Sanctions/ Motion to Compel Discovery" (doc. # 24), which was filed on February 29, 2020, was filed in bad faith and in violation of Rule 11 of the Federal Rules of Civil Procedure; and that the U.S. District Court's order granting, in part, the Defense Counsel's "Motion For Sanctions/ Motion to Compel Discovery" (doc. # 24), was designed in part to "save" the said Defense Counsel from themselves being subject to sanctions for having filed what the undersigned believes to be a clearly frivolous motion.

The experience and history of the American Bar prove that unless this and similar matters are fairly and adequately addressed, then no African American lawyer may function at the federal bar without unjust ridicule. See, e.g., Charles H. Houston, "The Need for Negro Lawyer," *The Journal of Negro Education*, Vol. 4, No. 1 (Jan., 1935). **Exhibit C**.

> The social justification for the Negro lawyer as such in the United States today is the service he can render the race as an interpreter and pro- ponent of its rights and aspiration. There are enough white lawyers to care for the ordinary legal business of the country if that were all that was involved. But experience has proved that the average white lawyer, especially in the South, cannot be re- lied upon to wage an uncompromising fight for equal rights for Negroes. He has too many conflicting interests, and usually himself profits as an individual by that very exploitation of the Negro which, as a lawyer, he would be called upon to attack and destroy…. In

2

the past it has been extremely difficult to get the most promising law graduates to go South. Even students Southern born and bred are loathe to return. They point out that they have no future in the South in politics; little or no voice in determining the officials who administer the law. They are uniformly excluded from the benefits of membership in bar associations, and have little opportunity for professional improvement through free and equal association with their white members of the bar. In many in- stances, they are the victim of subtle propaganda spread by the lower-class white lawyer to the effect that a Negro throws away his case in getting a Negro lawyer because a Negro lawyer has no influence with the Court.

It must therefore be recognized that the social circumstances of African American plaintiffs in civil rights litigation is distinctly and vastly different than those of backgrounds white litigants, lawyers, and judges. When one adds to this "distinctly and vastly different" set of social circumstances of African American litigants, the "conflicting interests" by white members of the bar and bench, as referenced above by Dean Charles Hamilton Houston, present the real possibility for the chances of experiencing a breakdown in communications between lawyers and litigants; a vast chasm in cultural understanding between them; and, consequently, for gross miscarriages of justice to become the evitable results. The "social justification" for African American lawyers, then, is the service which they may provide to the American bar in rectifying this problem.

## II.

I would also be remiss if I did not state that the Plaintiff's counsel is the executive director of the Poor & Minority Justice Association—Legal Defense Fund, Inc., which is owned by The Methodist Law Centre. This organization exists, inter alia, in order to assist poor and underprivileged African Americans and other insular minority groups with navigating the cultural barriers of federal court, and to make the federal courts accessible and affordable. The PMJA Legal Defense Fund, Inc. is patterned after the NAACP Legal Defense Fund, Inc. and serves a

similar purpose.[2]  The skill-sets needed to function effectively as a lawyer in this field requires a love for the plight of the disadvantaged.[3]  This is a personal injury case, a car-accident case, or an insurance liability case—one where lawyers are crawling on top of each other to take, because of the difficulties of proving liability and the unpopularity of civil rights plaintiffs and causes of action amongst the bar and bench. There is a dearth of lawyers—and particularly of African American lawyers—in this field. Hence, the "Methodist" nomenclature within the Plaintiff's law firm is to honor the life, philosophy and work of the Rev. John Wesley, who was the founder of Methodism, during a time in Anglo-American history when the economically disenfranchised were being ruthlessly neglected.

Under these social circumstances, during the course of federal court litigation, conflict may result as a direct consequences of the undue and unfair negative perceptions by white lawyers and judges. There is, quite frankly, the very unfair perception that African American lawyers are incompetent, insincere, unscholarly, lackadaisical, uncaring, and unprofessional; and the African

---

[2]  See, e.g., *NAACP v. Button*, 371 U.S. 415, 432 (1963)("[t]he NAACP is not a conventional political party, but the litigation it assists, while serving **to vindicate the legal rights of members of the American Negro community**, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society. For such a group, association for litigation may be the most effective form of political association.")

[3]  See, e.g., *NAACP v. Button*, 371 U.S. 415, 443-444 (1963)(" Lawsuits attacking racial discrimination, at least in Virginia, are neither very profitable nor very popular. They are not an object of general competition among Virginia lawyers; **the problem is rather one of an apparent dearth of lawyers who are willing to undertake such litigation**. There has been neither claim nor proof that any assisted Negro litigants have desired, but have been prevented from retaining, the services of other counsel. We realize that an NAACP lawyer must derive personal satisfaction from participation in litigation on behalf of Negro rights, else he would hardly be inclined to participate at the risk of financial sacrifice. But this would not seem to be the kind of interest or motive which induces criminal conduct.")

American civil rights plaintiffs are irrational and prone to commit fraud and perjury. See, e.g., Charles H. Houston, "The Need for Negro Lawyer," *The Journal of Negro Education*, Vol. 4, No. 1 (Jan., 1935).   Oftentimes, the smallest deviation from the norm, such as a missed deadline will become blown out of proportion. And thus the tendency to "sanction, sanction, and sanction" African American lawyers and judges is omnipresent during civil rights litigation. Our constitutional history provides plenty of evidence, as, for example, is shown in the case of *NAACP v. Button*, 371 U.S. 415 (1963). In *NAACP v. Button*, various unscrupulous "sanctions" efforts were made to curtail the ability of the NAACP legal staff to carry out its missions to assist struggling Negro plaintiffs. The Supreme Court held that those unscrupulous "sanctions" efforts violated the First Amendment right to petition the court for the redress of grievances.

We believe that the Defense Counsel's persistent and unscrupulous efforts to press frivolous and non-existent discovery issues (e.g., the Defendant's Motion For Sanctions/ Compel Discovery, doc. # 24) have been made with no good-faith basis and filed solely to impugn both the Plaintiff and the Plaintiff's counsel because (a) they are African American litigants/ parties/ cousel and (b) because the nature of the lawsuit involves federal civil rights that are designed to protect the federal and constitutional rights of African Americans, to wit, The Civil Rights Act of 1866 (42 U.S.C. Section 1981) and Title VII of the 1964 Civil Rights Act.   The hearing of April 29, 2020 clearly reveals that the Defense Motion For Sanctions/ Compel were filed in bad-faith and, for this reason, it undermines the First Amendment liberties of the Plaintiff and the Plaintiff's counsel to gain effective court access. *NAACP v. Button*, 371 U.S. 415 (1963). **Exhibit D**. It is thus from this legislative and constitutional historical viewpoint the Plaintiff and Plaintiff's counsel have reached this conclusion that the Defense Motion for Sanctions/ Compel were filed for no other reason than

to harass them because they had availed themselves of their legal and constitutional right to petition the federal government for the redress of grievances in a U.S. District Court.

## MEMORANDUM OF LAW

Rule 11 of the Federal Rules of Civil Procedure provides that no document or paper should be filed in court unless it is supported by fact, law or a good-faith reason for extending existing law. If a such a document is filed, then the movant must notify the filer of the infractions and allow twenty-one days for the filer to withdraw the motion or document before the movant files his or her Motion for Sanction. As per Rule 3.01(g), the undersigned provided the Defense Attorneys who are the subject of this motion with a 21-day notice that its "Motion for Sanctions/ Compel" violated Rule 11.

### Summary of Argument

1.      On or about February 29, 2020, the Defendant's counsel filed document # 24, which was titled "Defendant's "Motion For Sanctions or To Compel Plaintiff to Produce Documents and For Other Relief."

2.      As previously stated, the entire "Motion For Sanctions" was without merit, frivolous, outrageous, time-consuming, and filed in bad faith. It appears to have been filed for no other reason than because the Plaintiff and Plaintiff's counsel are African American, engaged in prosecuting a federal civil rights case, because it makes unfounded accusations of "spoliation" "bad faith" and "purposefully withheld" that have not even a scintilla of evidence in the record and (or) no palatable legal justification:

     a.   First, a hearing transcript of the Motion Hearing held on April 29, 2020, reveals the following undisputed facts:

i.   The Defense Attorney's "Motion For Sanctions" was not predicated upon a written letter from the Defense Counsel to the Plaintiff's Counsel that stated with specificity what the Defendant found "deficient" or lacked.

ii.  The Defense Attorney's only "evidence" of discovery deficiency was the Court's Order of January 8, 2020 (Doc. # 22).

iii. Neither the Defendant's (a) "Motion for Sanctions" (Doc. #24) or (b) the Defense Counsel's Oral Argument and presented with clarity any specific deficiencies.

iv.  The only evidence of communications or discussions between the Defense Counsel and the Plaintiff's Counsel, prior to the filing of the "Motion for Sanctions" (document # 24) was an oral telephone call during the last week of February 2020, where in Defense Counsel only asked the Plaintiff Leeks and the Plaintiff Counsel for the following:

   a. **Face Book postings (or other social media postings) wherein the Plaintiff Craig Leeks used the words "Nigga" or "Nigger" or words similar in terms of racial slang, or terminology.**

   b. There is no evidence in the record, whether written documents, or otherwise, to support any Defense-Attorney "claim," or "defense," or "assertion,"

7

that the Plaintiff had not complied with any specific mandate found in the Court Order of January 8, 2020.

c. At the oral hearing of April 29, 2020, the Plaintiff's counsel asserted that an oral agreement had been reached between the Plaintiff's Counsel and the Defense Counsel—notwithstanding the fact that a due diligent search for records had already been made by the Plaintiff Craig Leeks—that the Plaintiff Craig Leeks would have until Monday, March 2, 2020,to complete his search for records, to perform yet another search for Facebook/ social-media records (i.e., postings of the word "Nigga" or "Nigger," and then next to turn over any postings.

d. Although this Court apparently did not find that this communication occurred, or that the Defendant filed its "Motion For Sanctions" on Saturday, February 29, 2020, in bad faith—there have been no findings—NONE WHATSOEVER—SHOWING that the Defendant ever communicated any specific item, document, flash drive, disckette, etc., that it could affirmatively show that Plaintiff Leeks had failed to turn over, prior to filing its Motion for Sanctions on Saturday, February 29, 2020.

e. The Order Granting the Joint Stipulation was entered on January 8, 2020; but **Plaintiff Leek's deposition, where he discussed having a "flash drive" did not occur until January 31, 2020**.   Although any turnover of the said "flash drive" might not been governed by disclosure requirements under Rule 26 in general, it is quite clear that the "flash drive" would not have been specifically the subject-matter of the **Order Granting Joint Stipulation regarding discovery, entered on January 8, 2020**.

f. There is evidence—NONE—that shows or proves that the Defense Counsel specifically addressed the turn-over of a "flash drive," prior to its filing the "Motion For Sanctions" on February 29, 2020. (See Plaintiff's Exhibit A, showing that in Defense Counsel's two sets of communication regarding alleged past-due discovery, dated 1/13/20 and 2/12/20, that the Defense counsel did not mention "flash drive."

g. No mention of a "flash drive" occurred until Defense Counsel filed her "Motion For Sanctions" on February 29, 2020.   **The "flash drive" came up during the course of Plaintiff Leeks' deposition on January 30,**

**2020—but, again, there was no mention of the flash**

**drive** until the Defense Counsel filed her "Motion For

Sanctions" on February 29, 2020.

b.  Finally, the "Motion For Sanctions" was so vague and obscure that it was

virtually impossible to be fully understood or complied with:

   i.  The Plaintiff Leeks and Plaintiff's Counsel have, since the January 8,

   2020 order, made every good-faith effort to comply with any and all

   outstanding discovery requests.

   ii.  At the Court Hearing of April 29, 2020, every request which the

   Defendant requested from the Plaintiff, in its two email

   communications, dated January 13, 2020 and February 12, 2020, <u>were</u>

   <u>denied</u> by the U.S. District Court. (See **Plaintiff's Exhibit A, attached**)

---

**Items listed in Defendants emails of 1/13/20 and 2/12/20 are as follows:**

   Documents reflecting Mr. Leeks' income for 2019, including his tax documents form 2019.
·   Documents reflecting any other compensation, including benefits.
·   Documents supporting Mr. Leeks' claims for non-economic damages, including medical or other records supporting his claim for emotional distress/mental anguish.
·   Documents supporting his claims for expenses
·   Social media posts containing the word "nigger" or "nigga."
·   Social media posts relating to allegations in the Complaint, GeoPoint, or any proposed/past/possible illegal conduct.
·   **Documents reflecting Mr. Leeks' attempts to find employment/earn income following his separation from GeoPoint**.
·   Documents related to Mr. Leeks' job performance after he left GeoPoint in 2018.

---

10

<div style="border:1px solid black; height:40px;"></div>

iii. Even though this Court's Order of April 29, 2020 ordered that Mr.

Leeks conduct another search of social media documents the related or

pertain to "Geopoint," there <u>was absolutely no evidence in the record</u>

<u>whatsoever</u> that Mr. Leeks had not already fulfilled or discharged his

obligation to turn-over **"Documents reflecting Mr. Leeks' attempts**

**to find employment/ earn income following his separation from**

**Geopoint."** At the hearing on April 29, 2020, the Plaintiff's counsel

asserted, in no uncertain terms, that Plaintiff Leeks had already made a

good-faith effort to attain documents that fit this description but could

not find any such documents. (See, **Plaintiff's Exhibit B, attached**).

---

**Items turned over on March 2, 2020 and Email Communication from Attorney Rod Ford to Defense Counsel**

"Pursuant to Rule 26 of the Fed. R. Civ. P., attached please find additional documents, to wit:

2019 W-2 Form

Medical Bills

Medical Records

_____

"**Mr. Leeks was instructed to take the entire week-end to conduct a due diligence search of his Social Media for additional information, as you previously requested**.

"It was our understanding that we had until **March 2, 2020 (Monday)** to

---

completely and fully respond to your previous requests. For this reason, we believe that your Motion for Sanctions, etc., **violated Rule 11 of the FRCP.**

Sincerely,


Roderick O. Ford
Attorney For Craig Leeks"

iv. Because the Motion for Sanctions was so vague and unclear, the

Defense Counsel could not justify filing it.

(1). She could not justify the Motion for Sanctions from an

evidentiary standpoint (she had all the evidence that she needed to

defend her case, and could not explain her reasoning or justification

for even believing that some of the "evidence" which she sought

even existed; she could not, for example, prove that Mr. Leaks made

a posting on Facebook on November 3, 2018 that involved

Geopoint, but that he later "deleted it" in response to this litigation.

(2).  She could not justify the said Motion from a legal standpoint:

a.  The Defense Attorney's legal reasons used to justify

most or nearly all of her requests were (i) nonsensical;

(ii) clearly frivolous; (iii) made no sense from an

strategic sense from the viewpoint of a trial advocate. As

a consequence, the U.S. District summarily rejected the

Defense Counsel's requests for nearly every single item

12

requested in the Motion For Sanctions filed on February 29, 2020, and for which was heard on April 29, 2020.

b. Hence, or the reasons stated in "a." above, the Defense Attorney's "Motion For Sanctions" was filed and prosecuted in "bad faith," and for no good purpose save to denigrate and to harass the Plaintiff and the Plaintiff's counsel.

c. Finally, lest anyone reading this motion shall think this description of the Defense Counsel's evidentiary and legal reasoning an exaggeration, the record of the hearing of April 29, 2020 is self-explanatory.

3. I should here reiterate: the Order Granting in Part the Defendant's "Motion For Sanctions" was based upon:

a. Turning over a "flash drive" that had not been the subject-matter of any post-Joint Stipulation/ Discovery Order (Jan. 8, 2020) communications. The "flash drive" came up during Mr. Leeks deposition on January 30, 2020, and the Defendants made no mention of it until it filed its Motion for Sanctions on February 29, 2020. And when the "flash drive" was mentioned, it was only referenced, I think, once in the "Motion For Sanctions" (doc. 24), which is a 27 page document that covers at least a dozen discovery matters. Even if the Plaintiff and Plaintiff's counsel promised to turn-over the flash drive during the Deposition, that question of the "flash drive" simply never came up, and the

Plaintiff's counsel did not even consider it to be one of the issues that was the subject-matter of the "Motion For Sanctions," thus considering Plaintiff's Exhibit A and B, which clearly show that the "flash drive" was not a point of discovery dispute.[4]

b.      There is not a scintilla of information in the court record to shows that Plaintiff Leeks did not make a good-faith effort to conduct a thorough search of social media records for postings that referenced Geopoint or that related or pertained to Geopoint.   See **Plaintiff's Exhibit B**.

4.      Prior to filing this motion, a Rule 11 Notice was sent to the Defendant's attorney at least twenty-one days before the within motion was filed.

## <u>CONCLUSION</u>

The legislative history of laws and statutes reflects the evil for which they were enacted in order to rectify. As former Supreme Court Justice Oliver W. Holmes has correctly surmised, "[t]he life of the law has not been logic: it has been experience." The relationship of African American lawyers and litigants to the legal system have been uneven and troublesome, and for this reason laws, ethical rules, and statutes have been enacted in order to root out various forms of racial discrimination against black lawyers and litigants. This obligation extends to lawyers as well, because the experience and history race relations between white and black lawyers have also been littered with race and class bias, and unjustified threats of sanctions. Historically, as you also well know, when African Americans started to enter the legal profession during the early part of the

---

[4] The Defendant's acknowledge that the Plaintiff turned the content of the flash drive over to the U.S. Equal Employment Opportunity Commission, but it is unclearly precisely why the Defendant did not attain the said information pursuant to a F.O.I.A. request or a third-party subpoena.

14

twentieth century,[5] they were often the subject or recipients of undeserved criticism,[6] because their presence on the bar and bench presented a direct threat to racial bias and bigotry.[7]   Here, the record from the hearing of April 29, 2020 is clear: the Defendant's Motion for Sanctions/ Compel was made without factual or legal foundation—so much so, that an implication of racial discrimination against the Plaintiff and Plaintiff's counsel is fully appropriate.

WHEREFORE, the Plaintiff Craig Leeks respectfully asks that the Court issue an order granting the within Motion pursuant to Rule 11 of the Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED:


RODERICK O FORD PLLC
Attorney for Craig Leeks
Law Offices of Roderick O. Ford PLLC
1808 N. Morgan Street, Second Floor
Tampa, Florida 33602
(813) 223-1200
(813) 223-4226 facsimile

By:   __/s Roderick O. Ford_____
RODERICK O. FORD
Fla. Bar No.: 0072620

---

[5](See, e.g., J. Clay Smith, *Emancipation: the Making of the Black Lawyer 1844-1944*, citing Justice Thurgood Marshall stating: **"African-American lawyers have played a unique role in American history. Imbued with respect for the rule of law and the responsibility that such belief engenders, these lawyers have used their legal training not only to become masterful technicians but to force the legal system to live up to its creed: the promise of 'equal justice under law.'"**)

[6]  (See, e.g., J. Clay Smith, Jr., *Emancipation: The Making of the Black Lawyer* (Philadelphia, P.A.: The Univ. of Penn., 1993), pp. 12-13 (**"Claims of black lawyer's incompetence were leveled from almost the time blacks first entered the legal profession, but these claims intensified during the Post-Reconstruction era…."**))

[7] Id.

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served on May 15, 2020 on:

> Ms. Alicia H. Koepke, Esq.
> P. O. Box 1102
> Tampa, Florida 33601-1102
> akoepke@trenam.com

**\_\_/s/ Roderick O. Ford_____**

16